**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 28 EAP 2021 |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Superior Court entered on |
| | : | 2/16/2021 at No. 2187 EDA 2018 |
| v. | : | affirming the Order entered on |
| | : | 7/16/2018 in the Court of Common |
| | : | Pleas, Criminal Division, |
| GERALD DRUMMOND, | : | Philadelphia County at No. CP-51- |
| | : | CR-0015491-2008. |
| Appellant | : | |
| | | SUBMITTED: January 27, 2022 |

## OPINION

**JUSTICE WECHT**                                                **DECIDED: November 23, 2022**

In this PCRA[1] appeal, we consider a matter of first impression. We inquire whether trial counsel was ineffective for failing to object to a jury instruction in which the judge analogized jurors' application of the "proof beyond a reasonable doubt" standard to jurors' hypothetical decision-making regarding surgery involving a "precious one."[2] We conclude that instructions of this nature are reasonably likely to cause a jury to apply a diminished standard of proof in criminal cases, thus posing significant risks to a defendant's due process rights. Accordingly, we find arguable merit to Gerald Drummond's ineffective assistance of counsel claim. However, because counsel cannot be deemed ineffective for failing to anticipate a change in the law, we affirm the Superior Court's order affirming the denial of Drummond's PCRA petition. .

---

[1]     Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46.

[2]     Notes of Testimony ("N.T."), 12/17/2010, at 18-22.

* * * *

Shortly after 2:00 a.m. on July 13, 2007, the Philadelphia Police Department was notified of a shooting on Longshore Avenue. Officer Christopher Rommel reported to the location and found fifteen-year-old Timothy Clark and twenty-seven-year-old Damien Holloway lying on nearby Vandike Street. Clark had a large gunshot wound to the back of his head and was already dead by the time that Officer Rommel arrived. The bullet that killed Clark had traveled at a downward angle, and his hands were stippled.[3] The size of the bullet hole, the angle of the shot, and the presence of stippling all suggested to the police that Clark was killed execution-style by an assailant standing behind him while Clark knelt with his hands interlocked behind his head.

Holloway was shot in the cheek, but was still alive. He was taken to a local hospital. His face displayed significant stippling, indicating that he was shot from no further than three feet away. When the bullet entered his jaw, the bullet broke into numerous shards, one of which Holloway inhaled into his lung, where it became lodged. The gunshot wound caused significant bleeding at the base of Holloway's brain, causing brain damage. Holloway died two days later.

The investigation into the murders of Holloway and Clark led officers to suspect that Gerald Drummond and Robert McDowell were the perpetrators. Over one year later, Drummond and McDowell were arrested for the murders. The following evidence was presented at their subsequent death penalty trial.

Holloway, who is black, had an on-again, off-again relationship with Drummond's sister, Annie, who is white. Holloway and Annie Drummond had a child together. Rumor had it that Drummond did not approve of his sister's relationship with Holloway because

---

[3]    "'Stippling' is gunshot residue consisting of the unburned powder and debris that is discharged from a firearm that is 'tattooed' onto a shooting victim's skin in the form of pinpoint abrasions." *Commonwealth v. Murray*, 83 A.3d 137, 156 n.7 (Pa. 2013).

of their different races, and because Drummond believed that Holloway did not support the child that he had with Annie. On one occasion, Antonia Tisdale, who lived on Longshore Avenue, heard Drummond threaten Holloway with physical violence. Approximately one week before Holloway and Clark were murdered, Desiree Ford witnessed Drummond pull a gun on Holloway, use a racial epithet, and threaten to kill him. McDowell also had engaged in prior confrontations with Holloway, including one argument that involved McDowell's sister, and during which McDowell struck Holloway.

On the night of the Clark and Holloway murders, Antonia, Danyell, and Sharice Tisdale heard three gunshots at around 2:00 a.m. Danyell looked out her window and saw a white man wearing a black hoodie sprint past in the direction of Knorr Street, which is where Drummond lived. Over three years later, after some equivocation, Danyell told a detective that she believed that Drummond was that person. Danyell noticed that, in the days following the murders, Drummond and McDowell, both of whom were regulars in the neighborhood, were no longer seen in the area.

After the murders, McDowell told his girlfriend, Erica Marrero, that he had taken a gun to the scene and was supposed to kill Holloway, but could not go through with it. Instead, Drummond grabbed the gun from McDowell and shot Holloway. McDowell stated that Drummond wanted to kill Holloway as punishment because Drummond believed that Holloway had disrespected Drummond's sister, Annie. Drummond had no vendetta against Clark, but shot him because he could identify Drummond and McDowell as Holloway's killers. Later, during a walk on Vandike Street, McDowell pointed out to Marrero where the killings had taken place and showed her a bullet hole in a fence.

One week after the murders, Drummond was sitting in the living room of his mother's home on Knorr Street with Amy Rudnitskas, Nicole Penrose, and Tara McDowell (Robert McDowell's sister). According to Rudnitskas, Drummond described how the

murders had taken place. Drummond explained that he and McDowell had approached the victims in the street from the front and the back, forced the victims to their knees, ordered them to place their hands behind their heads, and then shot them. Drummond told the group that Clark had been killed first, and then Holloway. Amy Rudnitskas believed that Drummond was fabricating a story. However, a week later, Drummond repeated the story and admitted that he had been the shooter. He boasted that he took the gun from McDowell and shot Holloway, who he believed deserved to be killed, and then Clark, who was killed merely because he was a witness.

Penrose also testified for the Commonwealth. Penrose confirmed that Drummond had made the incriminating statements at his mother's home on Knorr Street.

Around Halloween 2007, Thomas Zehnder was at a party and overheard Drummond bragging about the killings. Although Zehnder admitting to having trouble remembering the events in question due to sustained drug use, he testified that he heard Drummond state that, because he had executed Holloway while on his knees and close up, Holloway would have to have a closed casket funeral. Zehnder heard Drummond admit that the reason for the killing was Holloway's disrespect of Drummond's sister, and that he then had to kill Clark because he did not want to leave anyone alive who could identify him. A few weeks later, Drummond warned Zehnder that, if he mentioned Drummond's confession, he would end up dead like Holloway and Clark.

Approximately one year later, Amy Rudnitskas brought up the murders while conversing with McDowell. McDowell again admitted that he was supposed to be the triggerman, but that he could not bring himself to do it. He explained that Drummond took the gun from him and committed the murders.

On September 6, 2008, police officers arrested Drummond and McDowell and charged them with murder, based upon statements obtained from witnesses. Thereafter,

associates of Drummond threatened or intimidated a number of witnesses. Drummond's brother, who had children with Amy Rudnitskas, threatened to take the children from her if she testified against Drummond. Someone put a menacing note and bullets in Rudnitskas' mother's mailbox. Thomas Zehnder was assaulted while in prison and had to be placed in protective custody. After Nichole Penrose testified at Drummond's preliminary hearing, she was robbed, beaten, and warned not to appear at any other court appearances.

Similarly, Tara McDowell, co-defendant McDowell's sister, threatened Susan Coulter. While under the influence of heroin, Marrero had told Coulter that McDowell had disclosed to Marrero his role in the murders and that he had given her a gun and asked her to dispose of it. Three years later, on the eve of trial, Coulter told police officers of Marrero's admission. Tara McDowell warned Coulter that there would be consequences if she cooperated in the prosecution. She even followed Coulter to her home. The threatening behavior forced Coulter to move out of the neighborhood. Coulter nonetheless testified at trial. No witness testified that Drummond himself requested, suggested, or otherwise was responsible for the intimidation tactics.

*　　*　　*　　*

At the conclusion of trial, the Common Pleas Judge gave the following instruction concerning reasonable doubt:

> Now, ladies and gentlemen, the Commonwealth bears this burden, proof beyond a reasonable doubt. It is the Commonwealth that must prove [*sic*]. So now we have the third leg of the house, the burden. It is the Commonwealth's burden to prove beyond a reasonable doubt each and every one of the elements of the crimes that are before you.
>
> It is the highest standard in the law. There is nothing greater but that does not mean that the Commonwealth must prove its case beyond all doubt. The Commonwealth is not required to answer all of the questions. In every trial, there are millions of questions you could ask. Well, I wonder if this happened? Well, I want to know about that. That is not the

Commonwealth's burden. The Commonwealth is not required to prove its case beyond all doubt. The Commonwealth is not required to meet some mathematical certainty. The Commonwealth is not required to demonstrate the impossibility of innocence.

A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to pause, to hesitate, to refrain from acting upon a matter of the highest importance to their own affairs.

A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence that was presented with respect to some element of each of the crimes charged.

***Now, ladies and gentlemen, I find it helpful to think about reasonable doubt in this way. Because I had the great fortune to speak with every one of you individually, I know that each of you has someone in your life that you love, a precious one, a spouse, a significant other, a sibling, a niece, a nephew, a grandchild. Each of you loves somebody.***

***If you were told by your precious one that they had a life-threatening condition and the doctor was calling for surgery, you would probably say, stop. Wait a minute. Tell me about this condition. What is this? You probably want to know what's the best protocol for treating this condition? Who is the best doctor in the region? No. You are my precious one. Who is the best doctor in the country? You will probably research the illness. You will research the people who handle this, the hospitals.***

***If you are like me, you will call everyone who you know who has anything to do with medicine in their life. Tell me what you know. Who is the best? Where do I go? But at some moment the question will be called. Do you go forward with the surgery or not? If you go forward, it is not because you have moved beyond all doubt. There are no guarantees. If you go forward, it is because you have moved beyond all reasonable doubt.***

A reasonable doubt, ladies and gentlemen, must be a real doubt. A reasonable doubt must not be imagined or manufactured to avoid carrying out an unpleasant responsibility. The fact that you stop and think about an issue doesn't mean you have reasonable doubt. Responsible people think about what they are doing and I'm asking you think deeply about my [*sic*] evidence. You may not find a citizen guilty based upon mere suspicion of guilt. The Commonwealth's burden is to prove a citizen who has been accused of a crime guilty beyond a reasonable doubt.

If the Commonwealth has met that burden, then the citizen is no longer presumed innocent and you should find him guilty; on the other hand, if the Commonwealth has not met its burden you must find him not guilty.

N.T., 12/17/2010, at 18-22 (emphasis added). Drummond's trial counsel did not object to this instruction.

Following deliberations, the jury found Drummond guilty of two counts of first-degree murder and one count each of criminal conspiracy, possessing an instrument of crime, and carrying firearms on public streets in Philadelphia.[4] At the conclusion of the penalty phase, the jury could not reach a unanimous decision on the death penalty. Thus, on January 13, 2011, the trial court sentenced Drummond to two consecutive sentences of life imprisonment for his first-degree murder convictions and a consecutive aggregate term of fifteen to thirty years in prison for the remaining convictions.

Drummond filed a direct appeal. The Superior Court affirmed the judgment of sentence, *see Commonwealth v. Drummond*, 279 & 430 EDA 2011, 2013 WL 11256554 (Pa. Super. Sept. 9, 2013) (unpublished memorandum), and this Court subsequently denied allowance of appeal. *See Commonwealth v. Drummond*, 528 EAL 2013 (*per curiam*). Drummond filed a petition for a writ of *certiorari*, which the Supreme Court of the United States denied. *See Drummond v. Pennsylvania*, 574 U.S. 906 (2014) (*per curiam*).

On October 1, 2015, Drummond filed a timely, *pro se* PCRA petition, and an amended, counseled PCRA petition on September 11, 2017. In his petition, among other issues, Drummond contended that his trial attorney was ineffective for failing to object to the trial court's reasonable doubt instruction.[5] Following a hearing, the PCRA court

---

[4] *See* 18 Pa.C.S. §§ 2502(a), 903, 907, 6108, respectively.

[5] Drummond also alleged that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose certain exculpatory evidence pertaining to agreements made with material witness Nicole Penrose, that trial counsel was ineffective

denied Drummond's petition, finding that the instruction, when read in the context of the court's instructions in their entirety, did not diminish the reasonable doubt standard. Drummond appealed to the Superior Court.

On February 16, 2021, in an unpublished memorandum, the Superior Court affirmed the PCRA court's order. After setting forth the standard of review and governing PCRA principles, the Superior Court recited the familiar rule that a jury charge must be read "as a whole to determine if it is fair and complete." *Commonwealth v. Drummond*, 2187 EDA 2018, 2021 WL 603244, at *3-4 (Pa. Super. Feb. 16, 2021) (quoting *Commonwealth v. Jones*, 954 A.2d 1194, 1198 (Pa. Super. 2008)). The intermediate court explained that an imperfect jury instruction does not trigger automatic reversal, so long as the balance of the instructions, "taken as a whole, fairly and accurately convey[] the essential meaning." *Id.* at *4 (quoting *Commonwealth v. Uderra*, 862 A.2d 74, 92 (Pa. 2004)). The Superior Court noted that trial judges possess vast discretion in formulating instructions, and are not required to use any particular words, so long as the instructions adequately and accurately state the law for the jury.[6]

Having outlined the basic governing principles, the panel turned to Drummond's challenge to the trial court's reasonable doubt instruction. The court emphasized that the use of real-life examples or hypotheticals is not a novel practice, and is one that has been

---

for failing to request a cautionary instruction with regard to the evidence of threats and intimidation against Commonwealth witnesses, and that trial counsel was ineffective for failing to request a mistrial after a Commonwealth witness testified that Drummond had racist beliefs and used racial slurs. Because we granted allowance of appeal only upon the jury instruction issue, none of these other challenges are before us today. *See Commonwealth v. Drummond*, 261 A.3d 1035 (Pa. 2021) (*per curiam*). Thus, we do not address them here.

[6] *Id.* (citation omitted).

approved by earlier Superior Court panels.[7]  Not only did the court find no patent error in the use of the medical illustration, but it noted that other portions of the instruction aligned closely with the suggested reasonable doubt instruction in the Pennsylvania Suggested Standard Jury Instruction Manual.[8]  Finally, the court concluded that, when read in conjunction with the otherwise accurately stated jury instruction, and because the instruction never relieved the Commonwealth of its burden of proof or removed the presumption of innocence, it was not reasonably likely that the jury applied a diminished reasonable doubt standard.[9]  Finding no defect in the instruction, the panel held that Drummond failed to demonstrate that his claim against trial counsel had arguable merit, defeating his ineffective assistance of counsel claim in its entirety.[10]

Drummond filed a petition for allowance of appeal with this Court, which we granted on August 25, 2021, limited to the following question:  "Was trial counsel ineffective for not objecting to the trial court's jury instruction on reasonable doubt?"  *Commonwealth v. Drummond*, 261 A.3d 1035 (Pa. 2021) (*per curiam*).

*      *      *      *

In PCRA appeals, our standard of review is well-settled.  When reviewing the denial of a PCRA petition, an appellate court must determine whether the PCRA court's

---

[7]      *Id.* (citing *Commonwealth v. Jones*, 858 A.2d 1198, 1201 (Pa. Super. 2004) (finding no error in a reasonable doubt instruction that contained an example contrasting a person's decision to cross a street at noon against heavy traffic with the same decision at midnight when there is no traffic)).

[8]      *Id.* (citation omitted).

[9]      *Id.* at 5.

[10]     *See, e.g.*, *Commonwealth v. Daniels*, 963 A.2d 409, 427 (Pa. 2009) (explaining that a court "need not reach every prong of the ineffectiveness test, if the petitioner fails to prove any one prong.").

order "is supported by the record and free of legal error."[11]  Generally, a reviewing court is bound by a PCRA court's credibility determinations and its fact-finding, so long as those conclusions are supported by the record.  However, with regard to a court's legal conclusions, appellate courts apply a *de novo* standard.[12]

To be entitled to relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the errors enumerated in 42 Pa.C.S. § 9543(a)(2), and that his claims have not been previously litigated or waived.  42 Pa.C.S. § 9544.  An issue is previously litigated if "the highest appellate court in which [the appellant] could have had review as a matter of right has ruled on the merits of the issue."  *Id.* § 9544(a)(2).  An issue is waived if the appellant "could have raised it but failed to do so before trial, at trial, . . . on appeal or in a prior state postconviction proceeding."  *Id.* § 9544(b).

To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).[13]  This Court has recast the two-part *Strickland* standard into a three-part test by dividing the performance element into two distinct components.[14]  To prove that counsel was ineffective, the petitioner must demonstrate: (1) that the underlying claim has arguable merit; (2) that no reasonable basis existed for counsel's actions or failure to act; and (3) that the petitioner suffered

---

[11]    *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117 (Pa. 2012) (citing *Commonwealth v. Rainey*, 928 A.2d 215, 223 (Pa. 2007)).

[12]    *Commonwealth v. Spotz*, 18 A.3d 244, 259 (Pa. 2011).

[13]    *See Sepulveda*, 55 A.3d at 1117.

[14]    *Commonwealth v. Busanet*, 54 A.3d 35, 45 (Pa. 2012); *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).

prejudice as a result of counsel's error.[15] To prove that counsel's chosen strategy lacked a reasonable basis, a petitioner must prove that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued."[16] To satisfy the prejudice prong, a petitioner must demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction.[17] Counsel is presumed to be effective; accordingly, to succeed on a claim of ineffectiveness the petitioner must adduce sufficient evidence to overcome this presumption.[18]

Drummond's ineffectiveness claim is predicated upon counsel's failure to object to a jury instruction. The well-settled principles pertaining to jury instructions guide our analysis. A trial court has broad discretion in formulating and delivering instructions to a jury.[19] When reviewing the exercise of that discretion, an appellate court must evaluate the trial court's instruction "as a whole to determine if it was fair or prejudicial."[20] A trial court may use such language as it chooses, "so long as the law is clearly, adequately, and accurately presented to the jury for its consideration."[21] "We will not rigidly inspect a

---

[15] *Sepulveda*, 55 A.3d at 1117 (citing *Pierce*, 527 A.2d at 975).

[16] *Commonwealth v. Cox*, 983 A.2d 666, 678 (Pa. 2009) (quoting *Commonwealth v. Williams*, 899 A.2d 1060, 1064 (Pa. 2006)).

[17] *Commonwealth v. Dennis*, 950 A.2d 945, 954 (Pa. 2008).

[18] *Sepulveda*, 55 A.3d at 1117.

[19] *Commonwealth v. Lesko*, 15 A.3d 345, 397 (Pa. 2011).

[20] *Commonwealth v. Hawkins*, 787 A.2d 292, 301 (Pa. 2001); *see also Commonwealth v. Stevens*, 739 A.2d 507, 527 (Pa. 1999) ("When reviewing a challenge to a part of a jury instruction, an appellate court must review the jury charge as a whole to determine if it is fair and complete.").

[21] *Id.* (citing *Commonwealth v. Jones*, 668 A.2d 491, 517 (Pa. 1995)).

jury charge, finding reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision."[22] "Error cannot be predicated on isolated excerpts of the charge, but it is the general effect of the charge that controls."[23]

\* \* \* \*

At the heart of Drummond's ineffectiveness claim is his challenge to the propriety of the trial court's proof beyond a reasonable doubt instruction. It is difficult to overstate the importance of proof beyond a reasonable doubt in criminal cases. This standard of proof is a prerequisite to the government's deprivation of a person's liberty, and it is one mandated by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[24] Justice Harry Blackmun once explained: "Our democracy rests in no small part on our faith in the ability of the criminal justice system to separate those who are guilty from those who are not. This is a faith which springs fundamentally from the requirement that unless guilt is established beyond all reasonable doubt, the accused shall go free."[25] Proof beyond a reasonable doubt represents society's judgment concerning "the degree to which we weigh the injustice of letting a factually guilty person

---

[22] *Jones*, 668 A.2d. at 1276.

[23] *Commonwealth v. Pursell*, 724 A.2d 293, 314 (Pa. 1999) (citing *Commonwealth v. Woodward*, 394 A.2d 508 (Pa. 1978)).

[24] *See, e.g., Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993) (stating that the beyond a reasonable doubt standard is the "basic protection . . . without which a criminal trial cannot reliably serve its function.") (citation omitted).

[25] *Victor v. Nebraska*, 511 U.S. 1, 28 (1994) (Blackmun, J., concurring and dissenting).

go free versus the injustice of convicting persons who are actually innocent."[26]  The standard is indispensable in "reducing the risk of convictions resting on factual error," and it "provides concrete substance for the presumption of innocence."[27]

It is by now a commonplace that this familiar standard "plays a vital role in the American scheme of criminal procedure."[28]  What vexes the courts, however, is the task of explaining this critical, yet amorphous standard to jurors in a way that allows them to perform their role objectively and that concentrates their focus exclusively upon the evidence of record.  A criminal defendant is entitled to a "positive instruction fully and accurately defining reasonable doubt."[29]  "Only in this way, can a jury fulfill its responsibility to decide the guilt or innocence of an accused.  In the absence of a proper reasonable doubt charge, an accused is denied his right to a fair trial."[30]  However, though the reasonable doubt standard "is an ancient and honored aspect of our criminal justice system, it defies easy explication."[31]  And, while the standard "is justifiably incanted and formulated to convey to the jury the serious degree of certitude it must have before it pronounces an individual guilty," it is, "like all human standards in a human system, . . .

---

[26]    Bruce Antkowiak, *Judicial Nullification*, 38 CREIGHTON L. REV. 545, 559 (2005) (summarizing Scott Sundby, *The Reasonable Doubt Rule and Meaning of Innocence*, 40 HASTINGS L.J. 457, 460-61 (1989)).

[27]    *In re Winship*, 397 U.S. 358, 363 (1970).

[28]    *Id.*

[29]    *Commonwealth v. Young*, 317 A.2d 258, 262 (Pa. 1974).

[30]    *Id.* at 263.

[31]    *Victor*, 511 U.S. at 5; *see also United States v. Hernandez*, 176 F.3d 719 (3d Cir. 1999) ("Reasonable doubt is not an easy concept to understand, and it is all the more difficult to explain.").

imperfect, somewhat arbitrary and fluid to the point of being remarkably imprecise in its case to case application."[32]

Put simply, "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury."[33] In an effort to alleviate, or at least mitigate, this difficulty, courts sometimes use hypotheticals or other illustrative devices that call upon jurors to contemplate decisions and circumstances that arise in their everyday lives. Such devices, when used in an effort to assist jurors in deciding whether the Commonwealth has satisfied its evidentiary burden, can create a significant risk of juror confusion or, more importantly, can have the deleterious effect of diminishing the Commonwealth's constitutional burden of proof. In assessing whether such devices contravene basic constitutional requirements, we ask "whether there is a **reasonable likelihood** that the jury has applied the challenge in a way that violates the Constitution."[34] Thus, the question in the case *sub judice* is whether there was a reasonable likelihood

---

[32] *Antkowiak*, *supra*, at 558. To demonstrate the difficulty of explaining reasonable doubt to jurors, Professor Antkowiak offers the following hypothetical:

> Imagine the difficulties that a trial court would have instructing a jury as to how it should go about finding whether the temperature in the jury room reached 78 degrees. If they were unaided by an accurate thermometer, the jury would simply have to go on its feeling as to whether the temperature rose to a particular point. But, unlike in circumstances of temperature where a Court could judge the accuracy of the jury's determination by reference to the tools of science, a jury's determination that the government's evidence has removed all reasonable doubt from the case is not one readily susceptible of accurate determination.

*Id.* at 558 n.49.

[33] *Miles v. United States*, 103 U.S. 304, 312 (1880).

[34] *Estelle v. McGuire*, 502 U.S. 62, 73 (1991) (citing *Boyde v. California*, 494 U.S. 370, 380 (1990) (emphasis added)).

that the jurors applied a diminished standard of proof when the trial court instructed them thus:

> *Now, ladies and gentlemen, I find it helpful to think about reasonable doubt in this way. Because I had the great fortune to speak with every one of you individually, I know that each of you has someone in your life that you love, a precious one, a spouse, a significant other, a sibling, a niece, a nephew, a grandchild. Each of you loves somebody.*
>
> *If you were told by your precious one that they had a life-threatening condition and the doctor was calling for surgery, you would probably say, stop. Wait a minute. Tell me about this condition. What is this? You probably want to know what's the best protocol for treating this condition? Who is the best doctor in the region? No. You are my precious one. Who is the best doctor in the country? You will probably research the illness. You will research the people who handle this, the hospitals.*
>
> *If you are like me, you will call everyone who you know who has anything to do with medicine in their life. Tell me what you know. Who is the best? Where do I go? But at some moment the question will be called. Do you go forward with the surgery or not? If you go forward, it is not because you have moved beyond all doubt. There are no guarantees. If you go forward, it is because you have moved beyond all reasonable doubt.*[35]

For the reasons that follow, we conclude that this instruction created such a likelihood and that Drummond accordingly has demonstrated that his claim has arguable merit.

*        *        *        *

Broadly speaking, Drummond's primary argument is that the trial court's surgery analogy had the practical effect of lowering the Commonwealth's burden of proof to something below proof beyond a reasonable doubt. In support of this contention, Drummond first argues that the instruction was framed unconstitutionally; it asked jurors to consider whether they would "go forward" with the surgical procedure instead of asking

---

[35] N.T., 12/17/2010, at 20-21 (emphasis added).

them whether the circumstances cited would cause them to "hesitate to act," a formulation that Drummond maintains is required to comport with due process.[36]  Second, relying upon *Brooks v. Gilmore*, 2017 WL 3475475 (E.D. Pa. 2017) (unreported), Drummond contends that the emotionally-charged nature of the analogy distorted the jury's objective task and overemphasized the necessity to act.[37]  In other words, by encouraging jurors to consider proof beyond a reasonable doubt in the context of a personal, emotional situation, the trial court likely caused the jurors to apply a standard of proof lower than that which is required by the Fourteenth Amendment.

While Drummond's argument premised upon *Holland* is not without support, it does not suffice to resolve the case in his favor.  *Holland* involved a prosecution of a husband and a wife for income tax evasion.[38]  During closing instructions, the trial court defined reasonable doubt as "the kind of doubt . . . which you folks in the more serious and important affairs of your own lives might be willing to act upon."[39]  The Supreme Court expressed a clear preference for a reasonable doubt instruction framed "in terms of the kind of doubt that would make a person hesitate to act, . . . rather than the kind on which he would be willing to act."[40]  Because the trial court in the instant case told the jurors to ask whether they would "go forward with the surgery or not,"[41] Drummond fairly argues that the instruction here conflicts with *Holland*'s preferred formulation.

---

[36]  *See* Brief for Appellant at 39 (asserting that *Holland v. United States*, 348 U.S. 121 (1954), "renders the instruction at issue constitutionally defective.")

[37]  *Id.* at 39-40.

[38]  348 U.S. at 124.

[39]  *Id.* at 140.

[40]  *Id.* (citation omitted).

[41]  N.T. 12/17/2010, at 18-22.

However, any effort to invalidate the instruction in this case based upon *Holland* fails. The Supreme Court did not invalidate the "willingness to act" or "going forward with an act" language as unconstitutional, nor has it done so in the years since deciding *Holland*. The *Holland* Court did no more than express a preference for one form over another. Although the Court stated that defining reasonable doubt as "something the jury would act upon" would cause "confusion," it simultaneously concluded that this framing would not result in "misapprehension," which was the Court's primary concern.[42] The Court "believe[d] that the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when there was some."[43] "[T]aken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury."[44]

As a general matter, we agree with the *Holland* Court's preference, and we urge trial courts to avoid instructions framed in terms of "going forward" or of a "willingness to act." We do not encourage courts to innovate hypotheticals, examples, or other illustrations in order to instruct juries, given the increased potential not only for confusion, but also for constitutional infractions. Nonetheless, because the Fourteenth Amendment neither mandates nor precludes any particular format for jury instructions,[45] it also does not necessarily or categorically prohibit the use of these illustrative devices. If a trial court elects to run the risk of the perils associated with such methods of instruction, we, like the Supreme Court of the United States, prefer that such instructions be framed in terms of a "hesitation to act," rather than a "willingness to act."

---

[42]    *Holland*, 348 U.S. at 140.

[43]    *Id.*

[44]    *Id.*

[45]    *See Victor*, 511 U.S. at 5 ("the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof").

\* \* \* \*

Drummond's second argument finds more purchase. Because of the threat that it poses to a criminal defendant's right to a fair trial, the use of personal, emotion-laden, judge-crafted hypotheticals must be viewed with substantial circumspection.[46] We endorse the sentiments offered by former Chief Justice Saylor in his concurring opinion in *Commonwealth v. Fisher*, 813 A.2d 761 (Pa. 2002) (plurality).[47] In that case, Fisher challenged (as part of an ineffective assistance of counsel claim) the trial court's use of a hypothetical in his first-degree murder trial. The trial judge there had attempted to explain the concept of proof beyond a reasonable doubt to the jurors by analogizing that concept to "a parent weighing the advantages of placing a child in private school rather than public school. The judge described the point at which the parent reaches a decision as the point where he overcomes reasonable doubt." *Id.* at 769. The *Fisher* Court assessed the instructions in their entirety and determined that they "clearly and accurately stated the law," and that counsel thus could not be deemed ineffective for having failed to object to the hypothetical. *Id.* at 770.

Although he concurred in the result, former Chief Justice Saylor expressed reservations concerning the use of "analogies or illustrations to explain reasonable

---

[46] Fair argument can be made that the use of hypotheticals of this nature should be prohibited outright. This is a tempting proposition, given the potential for harm engendered by the practice. However, we are cognizant that the United States Supreme Court has never condemned the use of hypotheticals as a matter of federal constitutional law, and has neither required nor prohibited the use by trial courts of any particular form of language when defining reasonable doubt within the ambit of our nation's Constitution. Accordingly, while we disapprove of the use of hypotheticals in the explication of the reasonable doubt standard, there is no federal constitutional justification for outright prohibition.

[47] At the time that *Fisher* was decided, Justice Saylor had not yet assumed the role of Chief Justice. Nonetheless, because he later held that title, we refer to him here as former Chief Justice Saylor.

doubt." *Id.* at 774 (Saylor, J., concurring). He deemed "inapt" the trial court's analogy of "a husband and wife arguing over the advantages and disadvantages of enrolling their child in a private school." *Id.* He perceived a difference "between making a future personal decision and deciding whether facts offered by the Commonwealth surrounding a past incident were sufficiently proven beyond a reasonable doubt." *Id.* He explained that illustrations of this nature risk suggesting "a preponderance of the evidence weighing process, obfuscating the applicable burden of proof." *Id.* at 773-74. The former Chief Justice emphasized that this is why the Pennsylvania Suggested Standard Jury Instruction Manual notes that its reasonable doubt instruction is "intentionally brief." *Id.* (citing Pa. SSJI (Crim) § 7.01, subcomm. note). The instructions subcommittee was concerned that any further elaboration ran the risk of prejudicially confusing the jury. *Id.* The subcommittee members, who undoubtedly spent countless hours discussing, drafting, debating, and redrafting the model instructions, obviously did not believe that hypotheticals were a viable explanatory tool for this nebulous yet critically important concept. Neither did former Chief Justice Saylor.

Former Chief Justice Saylor criticized the practice of using examples to explain reasonable doubt because "such examples tend to mislead the jury, trivialize its responsibility, and understate the burden of proof." *Id.* at 774. He then concisely summarized the problem inherent in conflating the proof beyond a reasonable doubt standard with hypotheticals concerning everyday human behaviors and thought processes:

> Moreover, most people do not make private decisions based upon a reasonable doubt standard, as "deciding the wisdom of future action involves a different type of judgment than that used in deciding whether something did or did not happen." *Bumpus v. Gunter*, 452 F.Supp. 1060, 1062 (D. Mass. 1978). Indeed, individuals often have minimal information upon which to base important future decisions, and nevertheless act despite reasonable doubts. A jury may also be inclined to accord undue weight to

an example, finding it easier to understand, and, during deliberations, may simply compare a defendant's conduct with the example.

*Id.* (footnote and some citations omitted).

The United States Court of Appeals for the Third Circuit similarly has recognized the dangers of instructing jurors to draw upon their own personal feelings when deciding whether the government has proven a defendant's guilt beyond a reasonable doubt. In *United States v. Hernandez,* 176 F.3d 719, 729 (3d Cir. 1999), the District Court had instructed the jurors that the point at which evidence exceeds reasonable doubt can be found "in your own head and your own soul and your own spirit and your own judgment." Hernandez argued that this type of instruction appealed to the jurors' subjective instincts rather than directing them objectively to review the evidence presented. Before assessing the merits of the claim, the Third Circuit insightfully explained the realities of how reasonable doubt can resonate in the minds of jurors, who are almost always non-lawyers:

> [G]iven the concerns about crime that are so prevalent in today's society, common sense suggests that it is particularly difficult for lay jurors to understand that they must acquit a criminal defendant if the prosecution does not establish guilt beyond a reasonable doubt, even if they feel that the defendant is probably guilty. Jurors may well be reluctant to free someone accused of a serious and violent crime "merely" because the government didn't prove beyond a reasonable doubt what they feel "in their hearts" is probably true. Yet, due process is satisfied by nothing less than a juror's understanding that he or she may not vote to convict a defendant based upon a belief "that the defendant is *probably* guilty. . . ." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (emphasis added). Rather, an impartial evaluation of evidence is required. "A juror is impartial if he or she can lay aside any previously formed 'impression or opinion as to the merits of the case' and can 'render a verdict based on the evidence presented in court.'" *United States v. Polan*, 970 F.2d 1280, 1284 (3d Cir. 1992). Reasonable doubt is, therefore, based upon reason rather than whim, possibilities or supposition. *Id.* at 1286.

*Hernandez*, 176 F.3d at 728 (alterations in original).

An instruction that tells jurors to draw upon their personal beliefs (or to find the answer in their hearts and souls) "clearly misleads the jury in a material way, to the prejudice of the defendant." *Id.* at 731. Beckoning jurors to draw upon their personal lives not only misdirects them from their neutral task of objectively evaluating the evidence presented by the parties, but also "allows each juror to judge the evidence by a visceral standard unique to that juror rather than an objective heightened standard of proof applicable to each juror. It allows jurors to convict based upon their individual 'gut feeling.'" *Id.*

We recognize that a trial is not a sterile proceeding denuded entirely of all human subjectivity. As the Third Circuit recognized, each juror must "subjectively believe that a defendant has been proven guilty." *Id.* at 732. But "that subjective belief must be based upon a reasoned, objective evaluation of the evidence, and a proper understanding of the quantum of proof necessary to establish guilt to a 'near certitude.'" *Id.* The Third Circuit in *Hernandez* concluded by specifically rejecting the contention that the balance of correctly-stated instructions mitigated the impact of the unconstitutional portion of the instruction:

> An instruction which allows a juror to convict because of his or her subjective feelings about the defendant's guilt, without more, is clearly inadequate. Here, . . . the District Court did tell the jury that their verdict had to be based upon the evidence, and that the government had the burden of proof. However, a likelihood of confusion remained as to the quantum of evidence necessary to sustain a conviction, and the level of certainty that a juror had to have as to the defendant's guilt, because the original explanation of reasonable doubt may well have remained in the juror's minds. Thus, a juror may well have concluded that a "gut feeling" as to the defendant's guilt was adequate to convict so long as that feeling was supported by a preponderance of the evidence (or even less). The reasonable likelihood that this may have happened is not mitigated merely because jurors understood that the government had the burden of proof.

*Id.* (citation omitted).

There is no material difference between telling jurors to rely upon their own hearts, souls, or spirits, and asking them to contemplate saving the life of a "precious one." Hypotheticals, illustrations, examples, appeals to jurors' emotions, etc., all suffer the same inadequacies, and all fundamentally misdirect the jury away from its solemn undertaking. As former Chief Justice Saylor explained, there are few, if any, parallels between real life decision-making and proof beyond a reasonable doubt. Not only does the average person not require proof beyond a reasonable doubt before making important decisions in his or her life, but often people press forward even though they harbor serious doubt and uncertainty, particularly when changing jobs, buying houses, or assisting in the health decisions of loved ones. These day-to-day decision-making processes are not comparable, let alone equivalent, to finding proof of a crime beyond a reasonable doubt.

Methods of hypothetical explication and idiosyncratic analogy allow for significant, subjective variance in how the criminal proof standard is executed. A criminal jury is made up of twelve individuals tasked with deliberating and reaching a verdict. Each juror arrives in the jury box with life experiences of his or her own. Each juror would act in his or her own individual manner when a "precious one's" life is on the line. Each juror would bring to bear different religious, moral, and/or social beliefs in reaching that decision. Juries are comprised of people of different temperaments, backgrounds and identities, people who come from different regions and outlooks. Such diversity necessarily would produce a different "gut feeling" in each juror about surgery decisions for "precious ones." When a trial judge tells the jurors to do anything other than objectively evaluate the evidence, the court effectively creates twelve standards of review, each one different from the next, silently generated in each individual juror's mind based upon the individual lived experiences and world views of that particular juror. For some, that standard might be higher than the point at which reasonable doubt exists on a continuum. For others, it will

be far lower. That is where the constitutional violation occurs, down in the murky realm that lies below proof beyond a reasonable doubt, where probabilities, whims, personal defaults, shorthands, habits of mind, and suppositions exist.[48]

We have tried at length to envision some hypothetical that does not implicate these concerns. We could not come up with a single usable one. We have no choice but to conclude that the only way to minimize (or at least curb as much as possible) the potential for confusion, misdirection, and constitutionally deficient consideration is to strongly discourage the use of hypotheticals and examples as a means of explaining proof beyond a reasonable doubt. The strongest method of avoiding these perils is the provision of neutral, objective instructions that accurately portray the law, and that do not depend upon idiosyncratic, subjective decision-making. While we decline to mandate one such charge over the other here, we note that examples of sound instructions include, in addition to the standard suggested instruction,[49] the following instruction endorsed by Justice Ruth Bader Ginsburg:

> [T]he government has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.[50]

---

[48] *See Hernandez*, 176 F.3d at 728.

[49] *See* Pa.SSJI (Crim) 7.01.

[50] *Victor v. Nebraska*, 511 U.S. at 27 (Ginsburg, J., concurring) (citation omitted).

As stated, another example of an objective reasonable doubt instruction, one that "has not been successfully attacked on due process grounds[,]" Pa.SSJI (Crim) 7.01, note, is the primary recommended instruction found in the Pennsylvania Standard Suggested Jury Instruction Manual. That standard instruction reads as follows:

> Although the Commonwealth has the burden of proving that the defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all doubt and to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence. A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his or her own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crime. A reasonable doubt must be a real doubt; it may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant duty.

Pa. SSJI (Crim) 7.01. It may be true enough that even objective instructions of this type can never guarantee perfect clarity for jurors. But at least this may help to assure us that verdicts, whatever they might be, are based upon proper and relevant considerations and are premised upon a reasonable doubt assessment made within the correct parameters rather than in wildly variable and subjective mindsets. Anything else engenders too much risk that jurors will base their verdicts upon a quantum of proof lower than the Constitution requires when the government seeks to deprive a person of his or her liberty.

* * * *

Notwithstanding our view that the use of hypotheticals, colorful examples, illustrations, judicial yarns, and the like, to explain proof beyond a reasonable doubt should be avoided, neither the United States Supreme Court nor this Court has construed the United States Constitution or the Pennsylvania Constitution to require such a prohibition. Thus, we return to the specific question of whether Drummond's substantive challenge to the "precious ones" instruction here has arguable merit for purposes of his ineffectiveness claim.

In assessing the impact of the errant instruction here, this Court does not need to conclude that the jurors understood the instruction in a way that in fact caused any or all of them to apply a diminished burden of proof. Given the confidentiality of jury deliberations, and the prohibition against jurors testifying about the deliberative process,[51] proving definitively that the jury used an unconstitutional standard is effectively impossible. All that this Court must decide is whether there was a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution."[52]

We first consider how the instruction in this case conflicted with the trial court's other directives. The trial judge repeatedly admonished the jurors to think and act objectively, to keep their personal feelings out of the process, and to rely only upon the evidence that came from the witnesses. The judge told the jurors that: (1) she would give them the law "evenhandedly and, most importantly, accurately," N.T., 12/12/2010, at 10; (2) their "decision about July 13, 2007 at 2:21 a.m. is to be based only on that evidence which was presented in this courtroom, the facts as you determine them to be and the logical inferences that flow from those facts," *id.* at 12; (3) "your determination of the facts in this proceeding must be based not on empathy or sympathy, not on prejudice for or against anyone," *id.* at 14; and (4) "[w]hat matters is the evidence. This is a dispassionate analysis that you undertake and as you evaluate the evidence, you are only to focus on whether the Commonwealth has proven each and every one of the elements of the crimes that are before you beyond a reasonable doubt." *Id.* at 14-15.

---

[51]   *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 861 (2017) (explaining the parameters and origin of the "no-impeachment" rule).

[52]   *Boyde*, 494 U.S. at 381.

After thus urging the jurors toward an objective frame of mind, the court's hypothetical demanded otherwise. Now, the jurors were told, they were supposed to consider their task not objectively, but on a very personal and emotional level. Their examination of the facts no longer was about being evenhanded, logical, or dispassionate. Their assessment turned instead to how each individual juror would react if one of his or her own "precious ones" was at a very real risk of death. The jurors were given free rein to do what the court had been telling them all along they were not allowed to do. Nothing but confusion could result from that 180-degree pivot. There is no reasonable possibility that the jurors ignored the emotional effect of the instruction and that they instead acted *only* in accordance with the other, objective instructions.

We recognize that the problematic aspect of the trial court's reasonable doubt instruction was bookended by other, correctly-stated and objectively-based reasonable doubt instructions. We do not overlook our practice of assessing instructions in the context of the trial judge's instructions as a whole, rather than in isolation.[53] We have considered all of the relevant instructions provided to the jury in this case in their entirety, and in the manner in which the instructions interact. Such analysis does not ameliorate the error, nor does it undermine our conclusion that it was reasonably likely that the jury here considered the evidence using a lower standard of proof. The principle of considering instructions as a whole might suffice to salvage a charge when a judge has made a minor misstatement in some peripheral instruction. But this approach offers no safe harbor when the misstatement confuses and distorts the most fundamental principle in our criminal law and when it instructs jurors to perform their otherwise objective task by likening it to an impassioned, last-ditch plea to save a loved one. Under these circumstances, comparing the valid portions of the instruction against the invalid ones

---

[53]     *See Hawkins*, 787 A.2d at 301.

does not suffice to neutralize the prejudicial effect of the error. If it did, there never could be a successful challenge to an errant reasonable doubt instruction so long as the judge correctly mentioned the standard somewhere—anywhere—in the record. If that were the case, then the Fourteenth Amendment would be toothless in this context.

We find further support for our conclusion that Drummond's claim has arguable merit in United States District Judge Gerald McHugh's analysis in the federal *habeas corpus* proceeding of *Brooks v. Gilmore*, 2017 WL 3475475 (E.D. Pa. 2017) (unreported). *Brooks* involved a similar instruction (given by the same Common Pleas Judge). We find Judge McHugh's examination of the instruction to be particularly compelling. We also agree with Judge McHugh's conclusion that the instruction diminished the applicable standard of proof.

Judge McHugh first noted that, at Brooks' trial, the trial court's reasonable doubt instruction had begun "without issue," as the instruction mirrored the Pennsylvania Suggested Standard Jury Instruction. After the "proper introduction," the trial judge issued to the jury the "precious ones" surgical analogy, and had then completed her instruction with an accurate statement describing reasonable doubt. *Id.* at *3.

Judge McHugh found that this instruction violated due process because it allowed the jury to interpret the relevant burden in a way that was a "degree of proof below" proof beyond a reasonable doubt. *Id.* (citing *Cage v. Louisiana*, 498 U.S. 39, 41 (1991)). The instruction, Judge McHugh concluded, was an act of discretion by the trial court that "distort[ed] the controlling legal principles." *Id.* He explained:

> To test the constitutionality of the instruction given here requires consideration of how a reasonable juror would analyze the hypothetical decision presented in the court's charge. In a case involving a "life threatening" condition affecting someone "absolutely precious" to a juror, where this is only one "known protocol" or "best protocol," what level of doubt would need to exist before a juror would deny them a chance at life? Necessarily, one would need a profound, if not overwhelming, doubt to deny a loved one their only or best opportunity for cure. But this is problematic

because the Supreme Court has held that elevating the level of doubt a juror must have before acquittal is required violates the Due Process Clause. In *Cage v. Louisiana*, 498 U.S. 39 (1990), after the trial court had defined reasonable doubt as "grave uncertainty" and "substantial" doubt, the Supreme Court ordered a new trial. In doing so, the Court observed: "It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." *Cage*, 498 U.S. at 41.

*Brooks*, 2017 WL 3475475 at *4 (citations modified). Judge McHugh acknowledged that the trial judge did not use words identical to those at issue in *Cage*, but nonetheless found that the hypothetical produced the same effect: elevating the level of doubt necessary to acquit. By using this instruction, the trial court "communicated the same concepts [as in *Cage*] by means of a powerful and emotionally charged metaphor. Objectively speaking, any person of decency and morals would strive to put aside doubt when faced with a single life-saving option for a loved one." *Id.* (footnote omitted).

Consistent with the well-established practice, Judge McHugh noted that, typically, reviewing courts must consider a trial judge's instructions in their entirety, rather than focusing on an isolated portion thereof. However, in this instance, the "precious one" hypothetical was the "centerpiece of the charge." *Id.* at *5. It was not "ancillary to the court's charge, but rather was conveyed to the jury as a model for understanding the very concept of reasonable doubt." *Id.* The problem, Judge McHugh explained, is that when reasonable doubt is expressed in this way it requires an "excessively high degree of doubt to reach an acquittal." *Id.* The hypothetical portion of the instruction is "structured in a way that would encourage the jury to resolve" doubts, rather than assess the reasonableness of the doubts and acquit if necessary. In other words, it creates "a strong motivation to act," which is not the jury's job. If there is reasonable doubt, the jurors must acquit, and the case is over. By contrast, the "precious one" instruction allows for an acquittal to occur only after the jury finds a very high degree of doubt, not just a reasonable one. *See id.* at *4.

Judge McHugh then offered the following passage from *Scurry v. United States*, 347 F.2d 468, 470 (D.C. Cir. 1965):

> A prudent person called upon to act in an important business or family matter would certainly gravely weigh the often neatly balanced considerations and risks trending in both directions. But, in making and acting on a judgement after so doing, such a person would not necessarily be convinced beyond a reasonable doubt that he had made the right judgment. Human experience, unfortunately, is to the contrary.

Judge McHugh found that this "insight applies with particular force where the personal situation the jury is told to use as a benchmark is a potentially life or death medical decision for a loved one." *Brooks*, 2017 WL 3475475, at *5. Thus, Judge McHugh concluded, it was reasonably likely that the jury applied a diminished burden of proof, and that Brooks' claim had arguable merit.

In accordance with Judge McHugh's opinion, and based upon all of the foregoing reasons, we conclude that Drummond has satisfied the arguable merit prong of the ineffective assistance of counsel test. Drummond has advanced a legal claim that manifestly has arguable merit. The hypothetical presented to the jury in this case conflicted with the court's other instructions to remain objective and neutral, tugged at the jurors' heartstrings in a powerful and intimate way, and directed the jurors to reach a verdict using a real-life scenario that rarely, if ever, is (or even could be) resolved by proof beyond a reasonable doubt. Much more frequently, the average person charts the course of his or her life using a much lower burden of proof. With the trial court's instructions here, it was not merely reasonably likely that the jury used an unconstitutional standard; it was almost a certainty.

*       *       *       *

Drummond's successful demonstration that his underlying claim has arguable merit does not mean that he is entitled to relief. He still must prove that counsel lacked a

reasonable basis for failing to object to the instruction.[54]  It is well-settled that counsel "cannot be held ineffective for failing to anticipate a change in the law."[55]  At the time of Drummond's trial in December 2010, no Pennsylvania court ever had invalidated jury instructions that used the hypotheticals which we disapprove of today.  To the contrary, at the time, the Superior Court had upheld such instructions, albeit in non-precedential decisions,[56] and this Court had never addressed the issue.  Thus, based upon the law extant in 2010, counsel was under no reasonable obligation to raise a challenge to the instruction, as any such objection would have lacked a then-existing legal foundation.  Counsel was not required to anticipate, nor could he have foreseen, that this Court would find the instruction to be constitutionally defective over a decade later.  For this reason, counsel cannot be deemed ineffective.

The order of the Superior Court is affirmed.

Chief Justice Todd and Justices Dougherty and Brobson join the opinion.

Justice Donohue files a concurring opinion.

Justice Mundy files a concurring and dissenting opnion.

---

[54]  *See generally Commonwealth v. Mitchell*, 105 A.3d 1257, 1266 (Pa. 2014).  In addition to the reasonable basis prong, Drummond also would have to demonstrate prejudice.  As to that prong, Drummond maintains that, because erroneous reasonable doubt instructions constitute structural errors, *see Sullivan*, 508 U.S. at 281 (citing *Rose v. Clark*, 478 U.S. 570, 577 (1986)), prejudice should be presumed.  The Commonwealth, on the other hand, argues this is not one of the rare circumstances where *Strickland* prejudice can be presumed, and that Drummond has failed to demonstrate prejudice in light of the compelling evidence of his guilt.  Because we resolve this case on the reasonable basis prong, we need not address prejudice.  We express no opinion on whether prejudice should be presumed under these circumstances.

[55]  *Commonwealth v. Cox*, 983 A.2d 666, 702 (Pa. 2009) (citation omitted).

[56]  *See, e.g., Commonwealth Gant*, 1612 EDA 2007, slip op. at 9 (Pa. Super. Sept. 21, 2009) (unpublished memorandum); *Commonwealth v. Clarkson*, 2859 EDA 2003, slip op. at 12 (Pa. Super. Aug. 25, 2004) (unpublished memorandum); and *Commonwealth v. Johnson*, 1639 EDA 1999, slip op. at 3 (Pa. Super. Aug. 23, 2000) (unpublished memorandum).